E. H. HOOPER AND JOHN CURTIN, PLAINTIFFS IN ERROR, v. J. D. BROWNING, DEFENDANT IN ERROR.

1. **Verdict Sustained.** For reasons set out at length in the opinion, *Held*, That there was evidence before the jury to sustain their verdict.

2. **Witnesses:** IMPEACHMENT. Before a witness can be contradicted by showing by the oath of another witness that he has made statements out of court inconsistent with his testimony, he must be interrogated as to whether he has made such statements, and his attention called to the time and place of making them, and to whom made.

3. **Evidence:** ADMISSIONS. The statements or admissions of a party to a suit can be proved against him only when such statements or admissions are so connected with the main transactions involved in the litigation as to be material to the issue or issues in the case.

ERROR to the district court for Jefferson county. Tried below before MORRIS, J.

*S. N. Lindley* and *W. O. Hambel,* for plaintiffs in error.

*B. S. Baker* and *W. H. Snell,* for defendant in error.

COBB, J.

The action in the court below was replevin, brought by Josiah D. Browning against E. W. Hooper and John Cur-

tin for the possession of a certain note, described in the petition as " one promissory note of six hundred dollars, dated July 19, 1881, signed by Jane E. Coburn, payable to the order of J. D. Browning, of the value of six hundred dollars." The case seems to have been originally brought and tried in the county court, but with what result does not appear from the record. It was appealed to the district court, where there was a trial to a jury, with a verdict and judgment for the plaintiff. The defendants bring the cause to this court on error. There are several errors assigned, all but one of which are as to the sufficiency of the evidence to sustain the verdict. The fourth assignment is, "That the court erred in excluding the testimony of A. H. Moulton."

The plaintiff, on the trial below, testified as a witness on his own behalf to the effect that after taking the note in litigation from the maker he went to St. Joseph, Mo., to live, and had the note with him, it not being due. I quote from his testimony: " After that there was a lady that had frequently asked me to loan her money. I think it was two or three months that she was after me for money. Eventually I agreed to let her have five hundred dollars, on certain conditions, and I let her have it. The day was set when she was to come to the State Savings Bank and get the money. I let her have it, and she gave me the agreement that the five hundred dollars was to be paid to the State Savings Bank by her, and she signed an agreement as strong as I could make it. I signed the note and gave it into the bank. About the time it became due she paid it off and returned the note to me, and said she had paid it off. I said, Where is the five hundred dollar note? She had a little portemonnaie, and looked for it, and said she didn't have it; and I said, I must have that; and she said she would get it for me the next evening or the next morning, and I kept after her for it; and I told her, eventually, ' If you don't get me that paper I will sue you.'

I didn't get it, and I commenced a suit against her.   Finally she returned with a Coburn note (*sic*), and I put it in a washstand drawer, where I kept papers; it was not used for a washstand.   That paper, the agreement, and my note, and other papers I could not find.   Other papers were gone, also.   That is about all there is to that that I remember now.   I tried for over two years, and sought every opportunity to get it, but never could get it."

Q.   State what you have done about it?

A.   I tried every way that I could.   Eventually, Messrs. Reed & Hall, a firm in the real estate business, said they had it; they are a firm in St. Joseph.

Q.   What conversation did you ever have with Reed & Hall about it?

A.   I told them I had lost such a note, and that I did not know what had become of it; and I asked both of them if they had heard of such a note, and, if they did, if they would let me know of it, and they said they would.

Q.   Who were Reed & Hall acting for?

A.   I think they were acting for Mrs. Noble.

Q.   Who had access to that stand drawer?

A.   The lady that was my wife at that time.

Q.   She is not your wife now?

A.   No, sir.

Q.   She is divorced from you now?

A.   Yes, sir.

Q.   What was done?

A.   I tried a great many times to get it; one time I telegraphed to Colonel Harbine's bank if such a note had ever been sent there for collection.

Q.   Did you come up here?

A.   Yes, sir.

Q.   Did you try to get the note?

A.   Yes, sir.

Q.   What become of the note?

A.   On one occasion Mr. Monroe said he had returned it to the State Savings Bank.

Q. What did you do then?

A. I went back.

Q. Did you succeed in obtaining a knowledge of its whereabouts?

A. Yes, sir; I telegraphed to Harbine, but did not succeed in getting my note, and returned to St. Joseph.

Q. Did you come here on purpose for that note?

A. Yes, sir, I did.

Q. What did Mrs. Noble ever tell you, if anything, in reference to this note?

A. She talked to me at various times; I don't know as I can remember what she said each time. She promised to return the five hundred dollar note, but she didn't do it, and I brought suit for it, but my attorney told me it was best to wait until the note became due, and replevy it; and that is the way I did.

Q. Did you ever have any conversation with Mrs. Noble in regard to this collateral note after you lost it?

A. Yes, sir, I did.

Q. What did she say?

A. She said she did not have it.

Q. From what source did you first learn that Curtin had it?

A. When they were taking depositions, and Reed & Hall were taking them; and I went over to St. Joseph, and that was the first. When I replevied the note here, that gentleman that I took it from was an entire stranger to me—Mr. Hooper, he said his name was. I came into town, and there was a man here that had my note; I asked some gentlemen if they knew him, and one of them did; and he showed me the note, and I asked him where he got that note; and he said "I found it on the prairie, near Belvidere;" and he said it looked as though it had lain there two or three days; and I said, "I had not been at Belvidere, and did not know who had left it there."

Q. Did you ever go to the State Savings Bank at Saint Joseph?

A.   Yes, sir; when I had been out here trying to find it, I went straight to the State Savings Bank and I asked them for it—if it had been returned there, and they said it had not; and I said, "There must be a mistake somewhere;" and I took out a letter from Mr. Exton, and showed him this letter; and he waited a few minutes, and he said "Reed & Hall have got your note;" and I saw Mr. Reed on the sidewalk, and I asked him who had it, and he said he did not know; and I said, "You have it;" and he said no, that they had not got it, but that a young man that was going to school here has got the note; and after that they owned that they had it.

\*    \*    \*    \*    \*    \*    \*

Q.   Who purchased that note from Mrs. Noble?

A.   Reed & Hall say they did.

Q.   For whom?

A.   For John Curtin.

Q.   Did they, previous to this time, know, and had they been informed of the condition under which it had been given?

A.   Yes, sir; I talked with them both several times about my loss of the note, and they always denied knowing anything about it at all.   Some time after Mr. France told me they had it, they owned it up.

Q.   Did you tell them that it was your note, and the circumstances under which it was left at the bank?

A.   Yes; I told them that it was stolen from me; I told them that all the time.

Q.   What is the value of this Coburn note?

A.   Six hundred dollars, the principal.

Q.   And the other?

A.   Five hundred dollars.

The plaintiff was cross-examined at considerable length; the only effect was to cause him to still further confuse his statement made in his examination-in-chief as to the papers which Mrs. Noble returned to him that he put in the stand

drawer, and which were afterwards stolen from him. He also stated that at the time of the service of the order of replevin on the defendant Hooper the two notes were attached together.

The testimony of C. B. France, president of the State Saving Bank of St. Joseph, whose deposition was taken and read upon the part of the defense, is scarcely inconsistent with the testimony of the plaintiff as to the loan of the five hundred dollars by plaintiff from the bank, the execution and delivery of the plaintiff's personal note therefor, and the pledging of the six hundred dollar note of Mrs. Coburn as collateral security for the payment of the same. He did not know Mrs. Noble in connection with the transaction. Says the money was not paid to her at the time, but, on the contrary, said that it was paid to Poindexter & Miller. He does not disclose his source of knowledge as to what disposition Browning made of the money, and it is quite obvious from his whole testimony that his statement in that respect was made on hearsay. His testimony leaves no doubt that the amount of the face and interest of Browning's note was paid into the bank by Mrs. Noble, and that witness as president of the bank assigned the note, and delivered both it and the six hundred dollar collateral note to her. That whether witness at the time considered it a payment of the note and release of the collateral on the purchase by Mrs. Noble of the principal and collateral notes, is by no means certain. He several times in his testimony speaks of the note having been paid. On cross-examination, in answer to the question: "Do you know how she came to pay it off?" he answered: "I don't know; she did pay it off, and took a transfer of it." This witness does not state, nor is he asked, whether the two notes were attached together at the time of their delivery to Mrs. Noble, or not. I mention this for the reason that if the notes were separate then there was no indorsement of the collateral note, and it being by its terms payable to J. D. Browning or

order the absence of an indorsement was a *caveat* to all the world. If they were attached, the five hundred dollar note might be regarded as an *elongment* of the other, and Browning's signature on the back of it regarded as an indorsement.

The testimony of the plaintiff is contradicted as to material facts by Catherine Noble and James M. Poindexter, witnesses for the defendants, whose depositions were read on the trial, and were it a question of the weight of evidence and of probabilities which we have to consider, I could scarcely agree with the jury in their conclusions; but these were considerations for the jury. Indeed I might say that were it not for the occasional recurrence of cases much like the one at bar, the use of juries in civil cases could scarcely be justified.

I think that there was sufficient evidence before the jury to have sustained a finding that the note was stolen from the plaintiff. It must be admitted that even if it was stolen, if it was endorsed in blank by the payee, and was passed before maturity to a *bona fide* holder for value, who received it without notice, in the usual course of business, such holder could defend its possession as against the payee. In such case, however, the burden of proof is upon the holder to show that he falls within the above terms. Dennis Curtin deposed on the part of the defendants that the defendant, John Curtin, had funds in the hands of Reed & Hall for investment, and that they bought the said note with such funds. He was not asked and probably knew nothing as to Reed & Hall's knowledge or notice of the history of the note before it came to their hands. They, and the person of whom they received the note, are probably the only persons who know the truth or falsity of the facts necessary to make them, or their *cestui que trust*, the *bona fide* holders of the note. Neither of them were called as a witness, and, although Mrs. Noble, the person who testified that she sold them the note, had her deposition

twice taken, she was not asked nor did she testify to any fact bearing upon the good faith in which they received or of the consideration which they paid for the note.

I conclude, therefore, that there is evidence to sustain the verdict of the jury.

At the trial the defendants called judge H. H. Moulton as a witness in their behalf, who, after having testified that there had been a trial of said cause before him (I presume in his capacity of county judge), the following question was asked him by counsel for defendants:

Q. State what Mr. Browning said at that trial as to the object for which the money was borrowed?

The plaintiff objected to the question for the reason that it is immaterial, irrelevant, incompetent, and that no proper foundation had been laid for its introduction; which objection was sustained, and the answer excluded.

Also the following:

Q. State whether or not he swore on the trial of this cause in your court, that this money was borrowed to pay a debt that his wife owed to Mrs. ———?

The same objection by the plaintiff, and the same ruling by the court.

Q. State whether or not Mr. Browning told you, or swore at that time, that this Mrs. Noble was worth about eighty thousand dollars. What did he say at that time as to her pecuniary standing?

The same objection, by the plaintiff, and the same ruling by the court.

These rulings and the exclusion of the testimony sought to be elicited by the above questions are assigned as error.

The object of these questions was to contradict the plaintiff's statements made on the stand in court, by proving by this witness that he had made inconsistent statements as to these facts out of court. It is, I think, a rule of universal application that before such testimony can be introduced over objection, the witness whom it is sought to contradict

must first be questioned as to whether he has made such statements, calling his attention to the time and place at which, and the person or persons to whom such statements were made, as near as may be. Then, if the witness deny having made the statement, out of court, and such statement is of a fact or facts material to the issue or issues involved in the case, the witness may be contradicted, and witnesses for that purpose may be called and examined. But if the statement is not of a fact material to the issue, the cross-examining party is bound by the answer of the witness, and cannot call or examine another witness for the purpose of proving that he has made contradictory statements out of court. This rule is deemed to be so well settled and universally understood and conceded that no authority need be cited to sustain it.

Counsel insist, however, that even if Browning as a witness might not have been contradicted, Browning as a party to the suit might. This I must confess presents a very different question. Were the statements which it is alleged the plaintiff made to or before the witness connected with the main transaction involved in the litigation, so as to appear to the court to be in the nature of a confession or admission of a material fact in the case, then, doubtless, such statements or admissions might be proved by any witness knowing the facts on the part of the defendant. See *Stephens v. Vroman*, 16 N. Y., 381. The difficulty here is, that the alleged statements of Browning sought to be proved by the witness Moulton were of matters not logically necessary to the existence of any material fact in the case, and but very remotely, if at all, connected therewith. The ownership and right of possession of the note in the plaintiff does not logically depend in any degree upon the purpose or object for which plaintiff borrowed the five hundred dollars from the State Savings Bank; and less still upon the number of thousands of dollars which Mrs. Noble was worth. It is clear, therefore,

that Browning's statements in respect to these matters made out of court, or in the county court, could not be proved as the admissions of a party to the suit against his interest. We have already seen that they were not admissible for the purpose of impeaching the party as a witness without first laying the proper foundation.

The judgment of the district court is therefore affirmed.

AFFIRMED.

THE other judges concur.