[No. 1037.    October 17, 1904.]

JOSE S. ESQUIBEL, Appellee, v. FRANCISCO S. CHAVES, Appellant.

### SYLLABUS.

1.    Section 1633, Compiled Laws of 1897, providing for the adoption by the convention of a political party of a mark or designating device for the use on its ballot and further providing that "it shall be unlawful for any other political convention, person or persons in such county to adopt or use any such mark or designating device for election purposes or to cause the same to be placed or printed on any ticket or ballot to be voted at such election, without having printed on such ticket or ballot all of the names of the candidates nominated by the political convention adopting such mark or designating device" has no reference to the voter and does not make his act in casting such ballot an unlawful one.

2.    The words "political convention, person or persons," and the words "adopt or use for election purposes," refer solely to the political management or agencies used in originating and furnishing ballots and not the persons whose sole connection with such ballot is voting the same.

3.    Where a statute creates a new offense and prescribes a penalty therefor such penalty is exclusive and the courts have no power to read into the statutes additional penalties.

4.    The sole penalty prescribed for the violation of section 1633 being a term of imprisonment for those legally responsible for the unlawful origination, use and circulation of ballots containing the mark or designating device of another party, no other penalty follows from the enforcement of said statute.

5.  The mere fact that a printed ballot contains at the head thereof the emblem that has been legally adopted by a political party but does not contain all of the names of the candidates adopting it does not under section 1633 render such ballot illegal and void and such ballot must be counted.

6.  The penalty of loosing his ballot will not in the absence of a statute so declaring be imposed upon a voter because of informalities in his ballot due to a violation of law by others and for which he is in no sense responsible.

Appeal from the district court of San Miguel county, before WILLIAM J. MILLS, Chief Justice. Reversed and remanded.

JONES & ROGERS for appellant.

Where a statute confers a new right privilege or immunity, the grant is strictly construed, and the mode prescribed for its acquisition, preservation, enforcement and enjoyment is mandatory.

Sutherland on Statutory Construction, sec. 458; U. S. v. Arredondo, 6 Pet. 725.

In the construction of a statute every word is, if possible, to be given some effect.

Allen v. Louisiana, 103 U. S. 80, at 84-85; Market Co. v. Hoffman, 100 U. S. 112.

The Republican party did not acquire the exclusive right to use the American flag as a party emblem.

Miller v. Merine, 43 Fed. 261; Steele v. Spencer, 1 Pet. U. S. 552.

The emblems were not the same.

Sec. 1633, Comp. Laws of New Mexico, 1897; Century Dict. and Cyclopedia; U. S. v. Gooding, 12 Wheat. 460-477; Evans v. State, 50 N. E. 820; Leggett & Meyer's Tobacco Co. v. Finzer, 128 U. S. 182; Philadelphia Novelty M'fg. Co. v. Rouss, 40 Fed. 585; Heinz v. Lutz, 23 Atl. (Pa.) 314; Ackens v. Smith (Colo.), 55 Pac. 162; 4 Am. and Eng. Ency. of Law, 333; U. S. v. Morrow, 4 Wash. 733; Dement v. State,

75 Am. Dec. 747.

Assuming that the law did make it unlawful for the Independent Republican party to adopt the emblem of a flying angel carrying a flag, as used on its tickets or ballots, such ballots were not illegal and void and should have been counted.

> Comp. Laws, sec. 1633; Scottish Mortgage and Land Investment Co. v. McBrown, 6 N. M. 587-588; s. c.; 153 U. S. 318.; see, also, Farmers, etc., Nat. Bk. v. Dearing, 91 U. S. 29; Barnett v. Nat. Bk., 98 U. S. 558; Oats v. Nat. Bk., 10 U. S. 250; Stevens v. B., 111 U. S. 199; Carter v. Carusi, 112 U. S. 483; 10 Ency. of Law (2 Ed.), 727-728; Kellogg v. Hickman (Colo.), 21 Pac. 325; Hopkins v. Olin, 23 Wis. 319; People v. Pease, 27 N. Y. 45; Allen v. Glynn, 20 Pac. 670; McCrary on Elections, secs. 538, 225; Bates et al. v. Crumbaugh et al. (Ky.), 71 S. W. 75; Moyer v. Vandeventer (Washington), 41 Pac. 61; Kirk v. Rhoads, 46 Cal. 399; Stachpole v. Hallahan (Mont.), 40 Pac. 80; Bowers v. Smith, 20 S. W. 101; Duncan v. Shenk, 109 Ind. 26; Parvin v. Winberg, 130 Ind. 569; Parker v. Orr, 158 Ill. 609; State v. Norris, 37 Neb. 299.

LESIS C. FORT for appellee.

If the Republican party did not acquire such right by the said adoption certificate and filing, then that part of section 1633 which provides that "It shall be unlawful for any other political convention, person or persons in such county to adopt or use any such mark or designating device for election purposes or to cause the same to be placed or printed on any ticket or ballot to be voted at such election," might as well be stricken from the statute books.

> Williams v. Thomas, 3 N. M. 553; Huntington v. Moore, 1 N. M. 440; Green v. Elwell,

1 N. M. 194; McDonald v. Colton, 1 N. M. 172; Badan v. Baca, 2 N. M. 194; T. v. Webb, 2 N. M. 147; T. v. Maxwell, 2 N. M. 250; Rodey v. Travelers Ins. Co., 3 N. M. 543.

Where the court sits as a jury, the same rules will be applied to a review of the findings, as would be in case of a verdict by a jury.

Carlot v. Maloy, 2 N. M. 198; Vasquez v. Speigelberg, 1 N. M. 464; Waldo v. Beckwith, 1 N. M. 97; Archibeque v. Miera, 1 N. M. 160; Ruhe v. Abren, 1 N. M. 247.

The Supreme Court will only re-examine the law as the judge has pronounced upon the state of facts presented to him.

Newcomb v. White, 5 N. M. 437; Hyde v. Booreau, 16 Peters 169; Bond v. Brown, 12 How. 254; Lacey v. Woodward, 5 N. M. 583; Corkins v. Prichard, 3 N. M. 278; Torlina v. Trorlicht, 6 N. M. 64; Pera v. Berla, 6 N. M. 247; and see, Hopkins v. Ollin, 23 Wis. 327.

### STATEMENT OF FACTS.

We are of opinion that the statement of facts by the appellant in his brief is a fair statement of the facts in this case, and we adopt them. They are as follows:

. "This is a proceeding under the statutes of the Territory of New Mexico commenced by the appellee to contest the election of appellant to the office of assessor of San Miguel county. Appellant and appellee were candidates for the office of assessor of San Miguel county at the election held on November 4, 1902. The canvass of the returns of the election showed that appellant had received a majority of 152 votes of the votes cast at that election and he was accordingly declared assessor of said county and a certificate of election was issued to him for said office.

"Thereafter on November 19, 1902, said appellee filed in the office of the clerk of the district court of San Miguel county his notice of contest, setting forth and specifying as his grounds of contest the following, among other things, to-wit: that the republican party on October 21, 1902, in convention assembled, adopted by resolution the American flag as the designating device to be placed at the head of its ticket to be voted for at the general election to be held on November 4, 1902, which designating device is shown by Exhibit 'A,' attached to the notice of contest, and printed and used said designating device at the head of all the tickets of said party used at said election; that the appellee, Jose S. Esquibel, was duly nominated as a candidate for the office of assessor of San Miguel county; that a certificate showing the adopting of the American flag as such designating device and the nomination of the candidates of said republican party, signed by the presiding officer and secretary of said convention, was filed with the probate clerk of San Miguel county, on October 29, 1902; that thereafter certain unknown parties caused to be printed and circulated certain slips of paper in size and form resembling ballots which could be legally used at said election, having at the top thereof a certain false designation, heading and designating device, to-wit: an American flag similar in size and form to and in the imitation of the said American flag so as aforesaid adopted and used by the republican party of San Miguel county, and also had printed at the top thereof and below the designating device the words: "*Boleta del partido republicano-independiente del condado de San Miguel,*" in English: "Ticket of the independent-republican party of San Miguel county," one of which printed slips of paper is attached to the notice of contest and marked Exhibit 'B'; that said last-mentioned printed slips of paper were calculated and intended to deceive the voters of San Miguel county at said election by reason and means of the false designa-

tion, heading and designating device, leading said voters to believe that said slips were tickets and ballots of the republican party for said election; that on said slips of paper purporting to be tickets of the independent-republican party, the name of Francisco S. Chaves, appellant herein, appeared and that said slips of paper were circulated on November 4th, at said election, with the intent to deceive the legal voters of San Miguel county, and were held out and represented to said voters to be ballots which could be legally cast at said election; that said printed slips of paper had printed thereon names other than the names of the candidates nominated by the republican party, to-wit, the name of said Francisco S. Chaves, appellant herein, and that a large number of said printed slips of paper, to-wit, 500, were cast and counted as ballots received by the judges of said election, and counted for said Francisco S. Chaves, appellant herein, for the office of assessor of San Miguel county, in making up the returns of said election; and said Jose S. Esquibel prayed judgment that he be declared entitled to the office of assessor of San Miguel county, and the right to exercise and perform the duties thereof, and for the costs of court.

"Thereafter, on December 9, 1902, Francisco S. Chaves, respondent and appellant herein, filed his answer to the notice of contest and, among other things, denied that many or any illegal fraudulent or void votes were counted for him for said office of assessor, by the election officers who made the returns of said election, and denied that Jose S. Esquibel, appellee herein, received a majority of the legal votes cast at said election for said office of assessor; and denied that said republican party of San Miguel county, had legally adopted the American flag as its designating device to be placed at the head of its ticket to be voted at said election; and denied that in accordance with a resolution of the republican party of San Miguel county, it had legally printed and legally used the American flag as a desig-

nating device at the head of its ticket to be voted at said election; and denied that said republican party of San Miguel county adopted said American flag as a designating device in such a manner as to give said republican party the right to the exclusive use thereof as a designating emblem for said ticket; and denied that the certificate filed with the probate clerk of San Miguel county, certifying to the candidates of said party and setting forth the emblem adopted by said party for use at the head of its ticket was filed at the time and in the manner and form provided by the laws of the Territory of New Mexico, so as to entitle said republican party to the exclusive use of the American flag as the emblem to be placed at the head of its ticket; and denied that certain unknown parties caused to be printed or circulated, printed slips of paper in size and form resembling ballots which could be legally used at said election, having at the top thereof a certain false designation, heading and designating device, to-wit, an American flag, similar in size and form to, and in imitation of the American flag adopted and used by the republican party of San Miguel county; and denied that the said printed slips of paper were calculated to or intended to deceive the voters of San Miguel county at said election; and denied that by reason and means of said alleged false designation, heading and designating device, voters were led to believe that said slips of paper were tickets and ballots of the republican party for said election; and denied that the voters at said election were led to believe that said slips of paper were tickets or ballots of the republican party for said election; and denied that said slips of paper were circulated on November 4, 1902, at said election with the intent to deceive the legal voters of said county of San Miguel; and denied that said slips of paper were not legal ballots or ballots to be cast at said election; and denied that at said election a large number of said printed slips, to-

wit, 500 were cast and counted as ballots for said Fran-cisco S. Chaves.

"Said answer stated as new matter, that on Oc-tober 27, 1902, the independent-republican party in convention assembled, nominated candidates for Terri-torial and county offices to be voted for at said election, did by resolution duly adopt the emblem placed and printed at the head of the ticket of the independent-republican party of San Miguel county, as shown by Exhibit 'B' attached to the notice of contest; and that the ticket of said independent-republican party, bear-ing such emblem at its head and containing names of the candidates of said party, including the name of Francisco S. Chaves, appellant herein, was filed in the office of the probate clerk of San Miguel county, on October 29, 1902, at 2 :15 o'clock p. m.; that at the time said ticket of the independent-republican party of San Miguel county, so bearing said emblem and the names of said candidates was so filed there was no other ticket on file in said probate clerk's office bearing any similar emblem or device for use at said general election to be held on November 4, 1902; and no other party, to the knowledge or inform: on of respondent, appellant herein, or of said independent-republican party, had adopted any such emblem or a similar emblem; and that said ticket of the independent-republican party was filed before the filing of the ticket of the republican party of San Miguel county, bearing the emblem of the Amer-ican flag and further stated that the paper purporting to be the ticket of the republican party of San Miguel county, marked Exhibit 'A,' and attached to said notice of contest was not a legal ticket and could not be legally used as a ballot at said election on November 4 1902, for the further reason that said ticket did not state upon its face that it was a ticket of the republican party, or that it was a ticket of the republican party of San Mig-uel county, to be used at said election, and said respond-

ent prayed judgment that said notice of contest be dismissed with costs.

"To this answer to the notice of the contest the contestant and appellee herein, filed a reply containing a general and special denial of each and every allegation of new matter in said answer set up and contained—except that he admitted the filing in the office of the probate clerk, at the time alleged, of the ticket of the independent-republican party, identical with Exhibit 'B,' but alleged that no resolution of any party adopting the emblem shown at the head of Exhibit 'B,' or showing that the nomination of the persons named in Exhibit 'B' as candidates for any office, was ever filed; and alleged, being a conclusion of law, that the filing of said ticket was an absolute nullity in law; and alleged that said Chaves and said independent-republican party had public notice of the convention of the republican party, and of the adoption of the American flag as its emblem.

"Thereafter on December 29, 1902, W. E. Gortner, was appointed Examiner to take the proofs in said cause and from the proofs so taken by said examiner and the pleadings in the case, it appears:

"That on the twenty-eighth day of September, 1902, the independent-republican party of San Miguel county was organized; that at that time and after the organization of that party, a party emblem was adopted in the form and device of a flying angel carrying in one hand a flag; that the proceedings of said convention were published in La Voz Del Pueblo, a weekly newspaper of general circulation throughout San Miguel county, showing, among other things, the adoption of the party emblem of an angel carrying in one hand a flag; that on the twenty-ninth day of September, 1902, the platform adopted by the independent-republican party containing the party emblem of an angel carrying in one hand a flag was printed and that 2000 copies of the printed platform with an imprint of the emblem so adopted were distributed throughout the county of San Miguel.

"That on the twenty-first day of October, 1902, the republican party of San Miguel county held its convention and nominated candidates for the various Territorial and county offices to be voted for at said election, and at that convention the American flag was adopted as the emblem to be placed at the head of its ticket to be used at said election; said emblem having been adopted by oral motion of a member of the convention, duly seconded and carried, but no written or formal resolution was ever adopted in reference to said emblem.

"That on October 27, 1902, and before any certificate of adoption of the American flag as the party emblem had been filed with the probate clerk of San Miguel county, or the ticket showing the candidates nominated for county offices had been filed as required by the statute of the Territory, the independent-republican party held its duly called convention for the purpose of nominating candidates to be voted for at the election to be held on November 4, 1902, for the various Territorial and county offices; and after said convention was organized various candidates were nominated to fill the said Territorial and county offices, and the convention adopted by motion an angel carrying in one hand a flag as the party emblem and device to be placed at the head of its ticket to be voted at said election.

"That on the twenty-eighth day of October, 1902, the tickets of the independent-republican party were printed containing the names of all the candidates nominated at the regularly constituted convention, held on October 27, 1902, together with the emblem of the party, to-wit; a flying angel carrying in one hand a flag, at the head of the ticket and a copy of said ticket with the names of said candidates and the imprint of said party emblem was filed in the office of the probate clerk of San Miguel county, at 2:15 o'clock p. m., on the twenty-ninth day of October, 1902, and before the ticket or emblem or certificate showing the party emblem or candi-

dates of the republican party had been filed in said office of the probate clerk.

"That on October 29, 1902, at 2:30 o'clock p. m. after the ticket with the names of the candidates and the party emblem of the independent-republican party had been filed, the republican party caused to be filed in the office of the probate clerk of said San Miguel county, a certificate signed by the chairman and secretary of its convention showing that the republican party had adopted the American flag as the designating device to be placed at the head of its ticket, accompanied by a ticket of the republican party showing the candidates of that party to be voted for at said election, with an imprint of a flag at the head of the ticket.

"It appears that at the election held in San Miguel county on November 4, 1902, for the purpose of electing officers for Territorial and county offices, the appellant who was the candidate for the office of assessor of San Miguel county, on the independent-republican ticket received 2436 votes, and the appellee, who was a candidate for said office on the republican ticket received 2284 votes, thus giving the appellant a majority of 152 votes; and thereafter on November 12, 1902, the county commissioners of San Miguel county issued to said Francisco S. Chaves, appellant herein, a certificate of his election to said office of assessor of San Miguel county.

"It was stipulated by counsel, as a part of the proofs in the case, that but 200 tickets of the independent-republican party were voted at said election and it was not proven nor does the record show that a single ballot of the independent-republican party, of the 200 ballots cast was voted in the belief that it was the ballot of the regular republican party—nor does it appear that anyone was deceived by the emblem or ballot of the independent-republican party, believing or mistaking it to the ticket or to contain the emblem of the regular republican party. On the contrary, however, it is shown that of the 200 independent-republican ballots cast at

said election, 101 of said ballots, identical with Exhibit 'B' attached to said notice of contest, were cast by qualified voters who cast such ballots knowing them to be the ballots of the independent-republican party of San Miguel county—that they were not deceived by the emblem on such tickets by reason of its resemblance to the emblem on the regular republican ticket—and that no one represented to them at said election that said tickets were tickets of the regular republican party.

"That on March 27, 1903, the court made its findings of fact and conclusions of law and decree wherein it found and concluded, upon the pleadings and stipulation of counsel, and the proofs taken at the hearing of said cause, among other things, that said Jose S. Esquibel was the duly nominated candidate of the republican party and that said Francisco S. Chaves was the duly nominated candidate of the independent-republican party for the office of assessor of San Miguel County to be voted for at the election to be held on November 4, 1902; that at the election said Francisco S. Chaves, received 2436 votes and said Jose S. Esquibel received 2284 votes and that a certificate of election was issued to said Francisco S. Chaves for the office of assessor of San Miguel county; that at said convention of the republican party held October 21, 1902, said party in convention assembled, adopted by resolution the American flag as the designating device or emblem to be placed at the head of its ticket for said county at said election; that a copy of said resolutions with a ticket attached showing said designating device or emblem and containing the names of the candidates of the republican party was filed in the office of the probate clerk of said San Miguel county on October 29, 1902 at 2:30 p. m. of said day; that at the convention of the independent-republican party held to nominate candidates to be voted for at said election, no resolution was adopted designating any particular emblem or device to be used as a designating device at the head of the independent-republican party

ticket of said county; that on October 29, 1902, at the hour of 2:15 p. m. of said day, a ticket containing the names of the candidates of said independent-republican party was filed in the office of the probate clerk, etc., and that the designating device or emblem at the head of said independent-republican ticket, was an imprint of the American flag supported by a flying angel, but that no resolution was ever adopted by said convention of the independent-republican party adopting any emblem or device for the head of its ticket, nor was any such resolution ever filed as provided by law; that 200 of the votes cast for said Francisco S. Chaves for assessor at said election, were cast on tickets voted by the independent-republican party, which bore at their head the imprint of the American flag supported by a flying angel, and were counted for said Francisco S. Chaves, and that if said 200 votes had not been cast and counted for said Francisco S. Chaves, said Chaves would only have received 2236. And as a conclusion of law, based upon the foregoing findings of fact, found that the said independent-republican party acquired no right to the use of such designating device or emblem, the American flag, but that the republican party did acquire the sole and exclusive right to use the imprint of the American flag as its designating device to be used at the head of its ticket at said election; that the 200 independent-republican ballots cast for said Francisco S. Chaves for assessor with the imprint of the American flag supported by a flying angel, were illegal and void, and should not have been counted for said Chaves in the canvass of the votes cast at said election. That excluding said 200 votes as illegal, said Jose S. Esquibel received a majority of the votes cast at said election, and that therefore said Jose S. Esquibel, was entitled to the office of assessor of San Miguel county, and the right to exercise and perform the duties and functions thereof.

"Upon said findings of fact and conclusions of law

the court found, adjudged and decreed that the said Francisco S. Chaves, was not legally elected to said office of assessor of said county of San Miguel, and that at said election said Jose S. Esquibel was regularly, duly and legally elected to said office of assessor for the period of two years, and it was ordered, adjudged and decreed that said Jose S. Esquibel, have and recover the said office of county assessor of said county of San Miguel, with all books, etc. thereof, and said Francisco S. Chaves, appellant herein, was ordered to forthwith surrender and turn over to said Jose S. Esquibel, the said office of assessor, etc.

"Thereafter on April 4, 1903, said Francisco S. Chaves filed his exceptions to the findings and decree of said court, and a motion for a new trial; which said exceptions to the findings and decree of said court and motion for a new trial, except exceptions numbered 1, 2 and 3, were, on July 9, 1903, overruled by said court, and a motion for a new trial was denied and an appeal to this court was granted."

### OPINION OF THE COURT.

POPE, J., (after stating the facts).—The conclusion which we reach in this case does not necessitate any difference with the court below as to the findings of fact, for the reason, that conceding the correctness of such findings we are of the opinion that they fail to sustain the conclusions of law reached by the learned trial judge. It may be properly assumed, in view of the findings below, that the republican party at its convention on the twenty-first day of October, 1902, held for the purpose of nominating candidates for office in San Miguel county, by resolution, or by action of the convention equivalent thereto, adopted the American flag as the designating emblem for the republican ticket for said county; that the said emblem with the names of the republican candidates, all duly certified, was prop-

erly filed in the office of the probate clerk on October 29, 1902, thereby making it unlawful for any other political convention, person or persons to adopt or use such emblem for election purposes except upon a ballot containing the names of all the republican nominees; that the independent-republican party and the managers thereof utilized at such election an emblem practically the same as that adopted by the republican convention and upon tickets not containing the names of all the republican nominees; that said independent-republican party failed to file in the office of the probate clerk any emblem and ballot duly certified to by the presiding officer and secretary if its convention, and thus failed to acquire any exclusive right to use said emblem or any other emblem; that at said election 200 of the votes cast and counted for the respondent Chaves were upon tickets voted by independent-republican voters, with the emblem practically the same as that upon the Republican ticket, and that but for the voting of said tickets for Chaves, Esquibel would have been elected.

The court concluded from this state of facts that the 200 independent-republican ballots were illegal and void and that, deducting these from the total vote cast for Chaves, the result was the election of Esquibel.

The case thus turns upon the question as to whether such use by the independent-republican voter of a ballot bearing the republican emblem, invalidated his ballot and necessitated its being rejected. This must of course be determined by the terms of the statute, compiled as sections 1633 and 1634. These sections are as follows:

"Section 1633. That hereafter it shall be lawful for any political convention held in this Territory or any county thereof, for the purpose of nominating candidates to be voted for at any election held in this Territory or any county thereof, to adopt by resolution, some mark or designating device to be printed on the face of and at

the head of the ticket or ballot, containing the names of the candidates for office nominated by such convention, and when such mark or designating device shall have been adopted by any such convention, and an imprint of such ticket or ballot containing such mark, or designating device so adopted, and the names of the candidate or candidates nominated by such convention, and certified to by the presiding officer of such convention, and the secretary thereof, shall have been filed with the probate clerk of the county in which such convention was held, it shall be unlawful for any other political convention, person or persons in such county, to adopt or use any such mark or designating device for election purposes, or to cause the same to be placed or printed on any ticket or ballot to be voted at such election, without having printed in such ticket or ballot all of the names of the candidates nominated by the political convention adopting such mark or designating device, and it shall be unlawful for any person or persons whatsoever after the adoption and filing of such mark or designating device, to print or cause to be printed, utter, distribute or circulate, or cause to be uttered, printed or circulated, any ticket or ballot having thereon such mark or designating device with any name printed thereon other than the name or names of the candidate or candidates nominated by the political convention adopting such mark or designating device: *Provided,* that nothing in this section shall be construed to prohibit any person from erasing or changing in any manner any name on any such ticket or ballot voted by such person; *And, further provided,* that this act shall not be construed as to prevent any executive committee of any political party holding such convention that adopted such mark or designating device, from having printed on any ticket or ballot containing such mark or designating device, the name or

names of any candidate selected by such committee by authority of such convention to fill any vacancy caused by the death, declination or retirement of any candidate nominated by such convention.

"Any person violating any of the provisions of this section shall be deemed guilty of felony, and upon conviction thereof before any court of competent jurisdiction, shall be punished by imprisonment in the Territorial penitentiary for not less than one year and not more than five years, at the discretion of the court trying the cause.

"Section 1634. That hereafter all tickets or ballots used at any general election held in this territory shall be printed on plain white paper, three inches in width and eight inches in length, or within one quarter of an inch of that size. No such ticket or ballot shall have any mark or number or designating device on the back, so that its character may be known when folded. If such ticket shall have upon its face the mark, number or designating device provided by the first section of this act, such mark, number or device shall be printed at the head of the ticket or ballot, that may be printed in large black letters, the character of such ticket or ballot, designating the political party or the particular question it is intended for, and then shall follow the name or names of the candidate or candidates and the office or offices for which they are candidates, or the question to be voted on. And it shall be unlawful for any person or persons to print or cause to be printed any ballot or ticket with any false designation, or having any false heading printed thereon, or any other ballot or ticket calculated or intended to deceive or mislead any voter. Any person violating any of the provisions of this section shall be punished, on conviction thereof before any court of competent jurisdiction, by a fine of not less than one hundred dollars and not more than five hundred dollars, or by imprisonment in the county jail not less than three months, nor more than six

months, or by both such fine and imprisonment at the discretion of the court trying the same."

It will be noted (1) that this statute is penal in character and must therefore be strictly construed; (2), that it is thereby made unlawful for any *political party, person,* or *persons, other* than that adopting the emblem, to *adopt* or *use* the emblem *for election purposes* or to print or cause to be printed, uttered, distributed or circulated or cause to be uttered, printed, or circulated any ticket bearing such emblem, *without having printed* thereon all the names of the candidates of the party adopting such emblem: (3), that any person violating any of the provisions of this section, are, upon conviction, to be imprisoned from one to five years in the penitentiary; (4), that the statute contains no provisions that the ballot containing such forbidden emblem shall not be counted.

The general rule of course is that provisions prescribing the penalty in a statute are exclusive and that the courts have no right to impose any penalty save as provided by the Legislature. Thus, in the case of Scottish Mortgage, etc., Co. v. McBroom, 6 N. M. 587 (affirmed, 155 U. S. 318), where it was contended that all written contracts providing for the payment of interest at a higher rate than 12 per cent were void because such contract as to the interest was unlawful, it was held: "If the Legislature has intended to forfeit the entire debt or to render the transaction void, nothing would have been easier than to have so declared." So also in the Farmer's, etc., Bank v. Dearing, 91 U. S. 35, it was said: "Where a statute creates a new offense and denounces the penalty or gives a new right and declares the remedy, the punishment or the remedy can be only that which the statute prescribes."

If therefore the Legislature has not by express terms or by necessary implication imposed this penalty upon ballots containing the forbidden emblem, this court has no power to attach such a penalty. The

first question for our determination, therefore, is as to the scope of the statutory provision making it a felony for "any other political convention, person or persons to adopt or use . . . for election purposes," an emblem previously adopted by a political party. Is this statute broad enough to include the voter? Was it the intention of the Legislature in this enactment to make criminal the act of casting a ballot bearing a previously adopted emblem? Or was it intended simply to include the political managers who either in convention or at the polls engaged by the use of the emblem of another party in an enterprise calculated to deceive and mislead the voter? We are of opinion that the law was clearly aimed against the latter and not the former. The words "political convention, person or persons" reasonably construed carry with them the idea of campaign or party management, of "the men who control," not the idea of the voter who simply takes at the polls the ballot handed him by the party worker. Then the qualifying word "other" preceding the words "political convention, person or persons" shows that the reference is to the same class previously mentioned in the statutes which upon examination will be found to be the convention or collection of persons assembled for party action, not the individual voter casting his ballot on election day. Those views are reinforced by the words "adopt or use . . . for election purposes" which follow in the statute. The first of these manifestly does not apply to the voter. He does not "adopt" the ballot. Equally repulsive to a sound construction is it to say that the words "use for election purposes" include voting. To assume this is to give the words a strained and unnatural meaning, to impute to the Legislature the folly of using four words to express an idea that the single word "vote" would have fully conveyed. It will be noted further that the "use" of the ballot "for election purposes" under this branch of the statute—which confessedly is the only portion with any semblance of reference

to the voter—is forbidden only where the "other political convention, person or persons" use it "without having printed" thereon the names of all the candidates nominated by the convention adopting the emblem. This manifestly confines the persons to be considered included in this portion of the statute to those charged with the responsibility of printing or having printed the ballots, in other words the management or agents of the party putting the ballots in circulation. As the voter as such has nothing to do with printing or "having printed" such ballots, he cannot be within the terms of a statute making the guilt or innocence of the person affected thereby depend upon whether such person has printed or has caused to be printed upon the ballot the names of all the candidates of the convention adopting the emblem. We are also of the opinion that the elaborate enumeration of acts constituting guilt, which follow in section 1633, as for instance causing the prohibited emblem to be placed on a ballot or printing uttering, distributing or circulating ballots containing it—show that the persons in the legislative mind were the persons in control of or acting as agents of party management, in the convention, upon the streets, at the polls, and not the voter. Construing this penal statute strictly, as we must, we hold that it is clearly not intended to apply to the voter.

This brings us to the next question, Is the voter, having done no unlawful act, to be made to suffer, to be made to lose his ballot simply because party managers have provided a ballot containing a prohibited emblem? Is he, because they may be subject to prosecution, to be punished for their acts? Further, is the public, which is entitled to his aid in settling questions of proper self government, to be deprived of his participation in such election simply because some person or persons other than himself have violated the law? The holding of the court below in effect was that no matter that the voter may have voted such a ballot in

entire ignorance that it contained an emblem inappropriate to the ticket he wished to vote, his ballot must nevertheless be arbitrarily rejected as void, because some one else has violated the law. This holding is in our judgment neither sound in principle nor justified by authority. It overlooks the well-defined distinction that while the voter by his own act may invalidate, and consequently lose, his ballot, the same result does not follow the acts of others leading to his voting an informal ballot. A few of the cases defining the doctrine will be referred to. In Gilleland v. Schuyler, 9. Kan. 591, it was said by the court, speaking through Brewer, J.: "The complaint is that the officers have designated an improper place and not that the electors have assumed to disregard the selection of either the Legislature or any officer. Where the electors have not themselves broken the law, ought they to be disfranchised?"

So also in McCrary on Elections, sec. 498, it is said: "Where the statute makes it a misdemeanor for any officer of elections to place any number or mark upon the ballot of a voter, but does not declare that ballots so marked or numbered by such officers shall be rejected, the true rule is to receive and count them. To reject such ballots would be to establish a rule under which an officer of elections could destroy the effect of a ballot cast in good faith by a legal voter by placing a number or mark upon it."

In Kellogg v. Hickman (Colo.), 21 Pac. 325, there was a statutory provision against distributing any ballots printed or written contrary to the kind prescribed. A number of ballots of a kind, both as to form and appearance, different from that prescribed by statute having been voted, the election was contested upon the ground that such ballots were illegal and should not be counted. That case was a stronger one than that at bar for the reason (as we conclude from certain expressions in the dissenting opinion of Chief Justice Helm), that the statute there provided no penalties whatever, even

against the persons chargeable with the informalities in the ballots. It was held by the court: "I see no, warrant in the statute for deducting these votes from the count. The courts are without authority to declare such penalty against the voter, unless the Legislature shall have declared that the act of voting such ballot shall be unlawful, and that such ballot, if voted by the elector, and received by the judges shall not be counted, and, in the absence of legislation to this effect, the courts may not declare as much. . . . . I find no case, and I think none can be found, where the deduction of such votes from the count is allowed in the absence of legislative expression against counting or receiving the same. . . . To deprive legal voters of their votes after they have been in good faith by ballots cast and counted without express statutory mandate_ therefor, would be an advance beyond all precedent, and as I think, in violation of correct principles."

So also, the Supreme Court of the same State, in the later case of Allen v. Clynn, 29 Pac. 670 holds (quoting from syllabus): "Where the law provides several penalties against county clerks for violation of its provisions, failure on the part of a clerk to make proper publication of nominations or printing the names of candidates under the wrong device will not invalidate the ballot." It is there also said (s. 673): "To overthrow the expressed will of a large number of voters for no fault of theirs, as we are asked to do, would be to defeat the purpose of our election laws, which is to obtain a full and fair expression of the wishes of the voters."

To the same effect is Moyer v. Van de Vanter (Wash.), 41 Pac. 62, where it was held: "In case of a violation of the law on the part of an election officer, punishment may be provided therefor, and in this way the law can be rendered effectual without going to the extent of depriving the voter of his right to have his vote counted in consequence of such violation;" and in Bates v. Crumbaugh (Ky.), 71 S. W. 75, it was said:

"The principle should be borne in mind that, as to duties required of the voter and duties required of election officers, a different rule prevails and when officers of election, by neglect or fraud, fail to perform their duty in a matter over which the voter has no control, the inclination of the courts is always that the voter shall not suffer by reason of the negligence of the officers; and while the provisions may be regarded as mandatory with regard to the officers, and his failure may subject him to punishment, it shall not disfranchise the voter who is not guilty of the violation."

In Kirk v. Rhodes, 46 Cal. 406, in considering whether a ballot should be rejected because it diverged from the requirements of the code in size, quality of paper and type and leading used in printing it was said: "The ballots are always furnished on the day of election by committees appointed for the purpose by the respective political parties or by independent candidates or their friends. The elector in but few instances ever sees the tickets until he approaches the polls to cast his ballot and it would be absurd in the extreme to require him to have a rule by which he could measure and ascertain whether his ticket exceeded or fell short of twelve inches in length by one sixth of an inch or whether the color of his ticket was of the exact shade of paper furnished by the Secretary of State." In our judgment there is as little obligation upon the elector under section 1633 of our Compiled Laws to seek the probate clerk's office to ascertain whether he had the proper emblem upon his ballot, as rested upon the elector under the California law to carry a rule or an expert on paper and printing with him to the polls.

Without further citation from the reports we may say that in our judgment the authorities fully sustained appellant's contention upon this point in his case. We are equally clear that the cases cited for appel-

lee are readily distinguishable. These are cases where the ballot was rejected either because the voter violated the law or because the statute expressly provided that the ballot should be rejected. Thus in Springer v. Thompson, 37 Neb. 39, the *voter,* in violation of express statute, endorsed his name upon the ballot and it was rejected. The same was true in Farnham v. Boland, 66 Pac. 200 where the *voter* placed a mark upon his ballot when. the law said absolutely that he should not do it. So in People v. Board of Canvassers, 129 N. Y. 395, 408, the language is that when a voter "attempts to express his will by the use, through either design or accident, of ballots *which the law declares shall not be counted,* the courts have no power to help him." In West v. Rose, 53 Mo. 350 there was an express statute that "no ballot not numbered shall be counted."

We are of opinion, therefore, that the court below erred in holding that the ballots in contest were void as a matter of law. If the Legislature be of the opinion that as a matter of public policy, in addition to making the guilty party manager or worker subject to prosecution, the ballot should be rejected, it is for that body so to declare. This court cannot do so for it. That the present legislative policy is not in that direction, however, is evidenced by the terms of the act of March 14, 1903, changing the method of the adoption of emblems, wherein there is an express provision that ballots upon which the emblem is improperly used shall be counted notwithstanding that fact.

We may add that the conclusion in the present case is rendered easier by the fact that it accords with the equities disclosed by the record. It is therein, in effect, stipulated that a sufficient number of the disputed ballots to elect the appellant were cast by persons who know that in voting they were casting the ballot of the independent-republican party and not the ballot of the republican party. Thus, whatever may have been the turpitude which prompted the unlawful appropriation

by the one party of the emblem of the other, there was as a matter of fact no fraud from the voters and no taint in the result.

The cause will be reversed and remanded for further proceedings in accordance with this opinion.

McFie and Parker, JJ., concur.

Mills, C. J., having tried the case below, and Mann, A. J., not having heard the argument, took no part in this decision.

### DISSENTING OPINION.

BAKER, J.—The majority of the court in this case has adopted my statement of facts. They might have done well to have adopted my whole opinion, but they have not seen fit to do so; therefore, I am unable to agree with the majority of my brethern in their conclusion of law in this case. It will be seen, however, that the opinion of the majority of the court taking part in this particular cause, Mann, J., not having heard the arguments and the Chief Justice, having heard the case below, not sitting, leaves the opinion of the court established by only one half of its members. However, under the rules of the court this is a majority of the court for the purpose of handing down this opinion.

I am not aware of the form of the opinion to be handed down by the majority of the court. I am only advised that a majority of the court are in favor of a reversal of this cause. For that reason, the following will be my opinion in the case upon the facts and the law as I understand it, without any reference to or comment upon the findings and reasoning by the majority of the court. This cause was assigned to me, in the first instance, to write the opinion of the court, and the following is the result of such assignment with the change from the plural to the singular when referring to the author of the opinion.

There is sufficient evidence to support the findings of fact by the trial court. It has been held time and again by this court that it will not interfere with the findings of fact by the trial court where there is suffi-cient evidence to sustain such findings. Romero v. Colman, 70 Pac. 559 (N. M.); Waldo v. Beckwith, 1 N. M. 97; Territory v. Webb, 2 N. M. 147; Beadeau v. Baca, 2 N. M. 194; Lynch v. Grayson, 7 N. M. 26; Hooper v. Browning, 19 Neb. 420, 27 N. W. 419. I am in accord with the findings of fact by the trial court.

There are two questions presented in this case: First, were the ballots of the independent-republican party cast at the November, 1902, election legal votes? Second, if not, should they have been counted?

The Legislature of the Territory of New Mexico had the undoubted right and authority to make such pro-visions and regulations as it deemed best to procure an honest election, so long as such regulations were not so arbitrary, unreasonable or obstructive as to abridge the right of a citizen in the exercise of his franchise. The provisions of section 1633 of the Compiled Laws of New Mexico, of 1897, are not beyond the power and au-thority of the Legislature to enact. Said section pro-vides as follows:

"Section 1633. That hereafter it shall be lawful for any political convention held in this Territory or any county thereof, for the purpose of nominating can-didates to be voted for at any election held in this Ter-ritory or any county thereof, to adopt by resolution, some mark or designating device to be printed on the face of and at the head of the ticket or ballot, contain-ing the names of the candidates for office nominated by such convention, and when such mark or designating device shall have been adopted by any such convention, and an imprint of such ticket or ballot containing such mark or designating device so adopted, and the names of the candidate or candidates nominated by such con-

vention, and certified to by the presiding officer of such convention and the secretary thereof, shall have been filed with the probate clerk of the county in which such convention was held, it shall be unlawful for any other political convention, person, or persons, in such county to adopt or use any such mark or designating device for election purposes, or to cause the same to be placed or printed on any ticket or ballot to be voted at such election, without having printed in such ticket or ballot, all of the names of the candidates nominated by the political convention adopting such mark or designating device, and it shall be unlawful for any person or persons whatsoever, after the adoption and filing of such mark or designating device, to print or cause to be printed, utter, distribute or circulate, or cause to be uttered, printed or circulated, any ticket or ballot having thereon such mark or designating device with any name printed thereon other than the name or names of the candidate or candidates nominated by the political convention adopting such mark or designating device: Provided, that nothing in this section shall be construed to prohibit any person from erasing or changing in any manner any name on any such ticket or ballot voted by such person: And further provided, that this act shall not be construed so as to prevent any executive committee of any political party holding such convention that adopted such mark or designating device, from having printed on any ticket or ballot containing such mark or designating device, the name or names of any candidate selected by such committee by authority of such convention to fill any vacancy caused by the death, declination or retirement of any candidate nominated by such convention.

"Any person violating any of the provisions of this section shall be deemed guilty of felony, and upon conviction thereof before any court of competent jurisdiction shall be punished by imprisonment in the Territorial penitentiary for not less than one year and not

more than five years, at the discretion of the court trying the cause.

Section 1634 of said Compiled Laws provides: "That hereafter all tickets or ballots used at any general election held in this Territory shall be printed on plain white paper, three inches in width and eight inches in length, or within one quarter of an inch of that size. No such ticket or ballot shall have any mark or number or designating device on the back, so that its character may be known when folded. If such ticket shall have upon its face the mark, number or designating device provided by the first section of this act, such mark, number or device shall be printed at the head of the ticket or ballot, that may be printed in large black letters, the character of such ticket or ballot, designating the political party or the particular question it is intended for, and then shall follow the name or names of the candidate or candidates, and the office or offices for which they are candidates, or the question to be voted on. And it shall be unlawful for any person or persons to print or cause to be printed any ballot or ticket with any false designation, or having any false heading printed thereon, or any other ballot or ticket calculated or intended to deceive or mislead any voter. Any person violating any of the provisions of this section shall be punished, on conviction thereof before any court of competent jurisdiction, by a fine of not less than one hundred dollars and not more than five hundred dollars, or by imprisonment in the county jail not less than three months, nor more than six months, or by both such fine and imprisonment, at the discretion of the court trying the same."

The republican party fully complied with the requirements of section 1633, supra, and thus acquired the sole right to the use of the American flag, as its mark or designating device for election purposes in San Miguel county for the November election, 1902. The trial court found the fact to be, that the mark or desig-

nating device used by the independent-republican party
was the same mark or designating device adopted by
the republican party.   I think I am safe in saying that
the flying angel, holding the American flag in one hand
is such a blending of angel, wings and flag as to make it
all flag.   Without close scrutiny, with a design to look
for the angel—which but very few politicians have in
mind—it would not be .discernible that there was any-
thing in the emblem of the independent-republican party
except the American flag.   So I start with the proposi-
tion that the emblem at the head of the independent-
republican ticket was the emblem lawfully adopted by
the republican party, in which emblem the independent-
republican party had acquired no right.   After a polit-
ical party has complied with the requirements of section
1633, the statute provides: "it shall be *unlawful* for any
other political convention, person or persons in such
county, *to adopt or use any such mark or designating
device for election purposes,* or to cause the same to be
placed or printed on any ticket or ballot to be voted at
such election, without having printed on such ticket or
ballot all the names of the candidates, nominated by the
political convention adopting such mark or designating
device, and it shall be unlawful for any person or persons.
whatsoever, after the adoption and filing of such mark
or designating device, to print, or cause to be printed.
utter, distribute or circulate, or cause to be uttered,.
printed or circulated any ticket or ballot having thereon
such mark or designating device with any name printed
thereon other than the name or names of the candidate
or candidates nominated by the political convention
adopting such mark or designating device."   The inde-
pendent-republican party used the emblem of the re-
publican party at the head of their ticket, and had
printed thereon the name "B. S. Rodey," a candidate
for delegate to Congress.   All the other names on said
ticket embracing names of candidates for legislative and
county offices, were different from those on the repub-

lican ticket, making it a clear violation of section 1633. The republican party having adopted the American flag, it was unlawful for any person to use such designating device for election purposes; in other words, it was unlawful for any person to use such designating device at the head of any other ticket than the republican ticket. The statute makes it unlawful for any person after the adoption and filing of such mark or designation, "to print, utter, distribute, or circulate, or cause to be uttered, printed or circulated any ticket" other than that of the party adopting it, with such device at its head. The statute in said section makes such unlawful act a felony and prescribes a severe punishment.

The two hundred and one persons, who it is stipulated voted the independent-republican party's ticket, *used,* for election purposes, *the emblem or designating device of the republican party*:   They were doing an unlawful thing when they used, uttered, distributed or circulated, or cause to be printed, uttered, distributed or circulated the said unlawful ticket, to-wit, the independent-republican ticket.   If the two hundred and one voters cast the independent-republican ticket knowing it to be unlawful, they committed a felony.   The law imposes upon them the knowledge that the republican party had adopted such emblem.   Being possessed of that knowledge, they knew when they handled, or, in the language of the statute, *used,* such independent-republican ticket, they were violating the statute.   Of course, if they did not know that the independent-republican ticket handed to them to vote was the independent-republican ticket, and mistook it because of the emblem placed thereon, for the republican ticket, they would not be guilty of a crime because of a want of criminal intent, but they, as well as the party whose ballot they intended to cast, would be defrauded because of such fraudulent ballot.   It can not be contended that the Legislature intended that the care taken to have the emblem adopted by any political party—and the use of the em-

blem is obvious—could mean that the using of the same emblem by any other party is a lawful act. In other words, the handling of an unlawful ticket could not be lawful. It was unlawful to print, handle or use the independent-republican ticket because it was an unlawful ticket. It was unlawful to handle a party ticket with an emblem thereon which emblem had been adopted by another party. It is never unlawful to do a lawful thing, and never lawful to do an unlawful act. If the independent-republican ticket was an unlawful ticket, what validated it? The unlawful act of handling and putting it in the ballot box? There is a clear distinction between the errors of officers who have in charge the preparing and furnishing of official ballots, which would have the effect of depriving voters of their vote, and a total disregard of the law by the electors themselves. It is said in Wilkins v. Duffy, 70 S. W. 668 (cited by appellant), that "the weight of authority is *clearly in favor of holding the voter on the one hand to a strict performance of those things which the law requires of him,* and on the other hand, of relieving him from the consequences of the failure on the part of the election officers to perform their duties according to the letter of the statute, when such failure has not procured a fair election." So it should be with each of the two hundred and one voters that cast the independent-republican ticket, knowing that it was in violation of law to use or handle unlawful ballots. The two hundred and one electors were not disfranchised because they could not lawfully cast the independent-republican ballot: They could have taken a republican ticket and changed it by taking off and putting on names to their satisfaction, or might have changed the democratic ticket to their taste, or might have prepared an entire ballot of their own. To hold that the illegal ballot used in the San Miguel county election should be counted would be to make the entire intent and object of the Legislature to protect the ignorant and credulous voter, ineffective and

useless and to put into the hands of dishonest and unscrupulous politicians additional facilities to destroy honest elections.   Desire by all parties to win in elections seems at times and places to destroy all sense of honesty and often leads to riot, bloodshed and murder— nothing seems to escape its vile influence.   To allow a sufficient number of voters after an election to come into court and swear that they voted knowingly the unlawful ballot, and thus legalize an unlawful ballot and to make good that which is all bad, is to open the door to the dishonest, to deceive the ignorant and unsuspecting voter and to have the fruits of their deception and fraud inure to their own benefit; to say nothing of the imposition, fraud and crime committed upon the deceived elector and upon the body politic.   The use of an emblem by a political party so nearly the same as that used by another party as to be undiscernible to the casual observer, is to use it for the purpose of deceiving and defrauding the voters.   Otherwise it would not be used. The plan to thus use an emblem is a fraudulent and unlawful design.   It was not the design or intention of the Legislature to pass a law that some one might be benefited by its violation, but to secure honest elections; and there is nothing so effectual to secure the observance of the election law as to make unlawful ballots unlawful and the law so enforced as to prevent the unlawful acts of electors from transforming unlawful ballots into lawful.   The politician is a dangerous custodian of such power.   Section 150 of chapter 26 of the Compiled Laws of Nebraska, 1893, provides:   "In the canvass of votes, any ballot which is not endorsed as provided by this act by the signature of two judges upon the back thereof, shall be void and shall not be counted, and any ballot or parts of a ballot from which it is impossible to determine the elector's choice shall be void and shall not be counted; provided, that when a ballot is sufficiently plain to gather therefrom a part of the voters intention, that it shall be the duty of the judges of election to

count such part." Section 154 of said chapter, among other things provides: "No elector shall place any mark upon his ballot by which it may afterwards be identified by him." *There is no provision in the Nebraska statute that should the elector place any mark upon his ballot which would identify it as the one voted by him, it should not be counted.* In Spurgin v. Thompson, 37 Neb. 39, the facts presented were that a ballot was found in the ballot box endorsed "Ingleham." The court· said: "Clearly, the endorsement of the word 'Ingleham' was within the prohibition of the statute and the ballot in question should, therefore, be rejected." *The fact that it was an illegal ballot was the reason for rejecting* it; made illegal by the unlawful act of the elector, although it was the clear intention of the voter to vote for the candidates appearing on his ballot. His unlawful act disfranchised him. The fault was not with the law but with the voter. He had nothing or nobody to complain of but himself. The candidates had no vested right in his vote, nor in the voter, and if they acquired any by purchase or any other unlawful means they deserved to lose it in the interest of honest elections and honest government.

The State of California has a statute prohibiting the placing of any mark upon the ballot, in the exact word of the statute of Nebraska. In Farnham v. Boland, 66 Pac. 200, after stating the facts, the court said: "Under objection No. 1, we find a class of ballots counted by the trial court where a cross is placed in the square, there being no candidates named opposite the square. Such a cross is not in a legal place. The voter had no right under the law to place it there, and as a designating mark it demands the rejection of that class of ballots. Under objection No. 2, the. cross is found upon a class of ballots directly upon the line dividing two squares. There is also a cross in each of the squares after the respective candidates names. Thus is found

a cross not authorized by law, which may well serve as a means of identifying the ballots, and the ballots so marked should be rejected.   Under objection No. 3, the court finds a class of ballots where two crosses are made after the candidates' names, one within the square and one without the square.   There is no simpler way of evading the provision of the law than for the voter to mark his ballot in this manner.   These crosses so placed are clearly identifying marks and the ballots so numbered should be rejected.   In objection No. 4, the court finds a class of ballots with two crosses in the square. Upon some of these ballots the crosses are entirely separate and upon others interlaced and joined in many different ways.   The law says the voter shall stamp a cross after the name of the candidate not two crosses or three crosses, but a cross.   Two crosses in the square is no less a mark of identification than two crosses are without and one within the square.   An allowance of this practice would furnish a simple expedient by which the law could be violated.   Two crosses in the square is not a legal mark upon the ballot.   The law only contemplates one cross, and therefore the ballots so marked should be rejected.''   The judges of election in such cases had no difficulty in determining for whom the elector intended to vote.   The decision of the Supreme Court of California was not put upon the ground that you could not discern the intent of the voter, but upon the ground that it was an illegal ballot, the elector himself doing the illegal thing.   Therefore, the disfranchisement of such elector was his own illegal act.   The case of People ex rel. Nichols v. Board of Canvassers, 129 N. Y. (Court of Appeals) 395, was one in which the officers prepared and distributed the official ballots, which ballots required the endorsement "Official ballot for Second district poll, town of Camillus, November 3, 1891." The same endorsement was required for every poll in the town, with the exception that it must designate, "1st," "2nd," "3rd," "4th," etc., being the number of the

poll. It was found that in the second election district of that town ballots were cast with the endorsement "first district," and other similar errors or mistakes were found where ballots endorsed for one district by number were cast in another district. The court went a great deal further in that case than the writer of this opinion endorses. After setting out the requirements of the statutes of New York, as to the style, form, etc., of the ballot—which is the same requirement in substance of the statutes of every State that has adopted the Australian ballot system, with more or less modification—the court said: "Most of these stringent provisions would be little short of absurd, *if it can be supposed the ballots bearing the endorsement which designates them from all others in use at the polls can be lawfully put into the ballot box.*" The court further said: "But it is said that this result will disfranchise the electors who cast these ballots in good faith, believing that they were proper official ballots. The answer is that when an elector attempts to express his will at an election by the use through fraud, design, or accident of ballots which the law declares shall not be counted, the courts have no power to help him." . . . *"The law contemplates that the elector will not blindly rely upon any one—not even the election officers in the preparation of the ballots."* That court also said: "That the use of these ballots was at best a wholly unnecessary and thoughtless act on the part of the voters who cast them is entirely evident." In West v. Ross, 53 Mo. 350, under a statute that provided "that no ballot not numbered shall be counted" there were found ballots in the ballot box not numbered. It was conceded that no fraud was intended by the inspectors in failing to number the ballots, but that it was occasioned by inadvertence on their part. It further appeared that the number of ballots counted corresponded with the number of votes appearing on the poll list. The court in that case, however, held that these votes were void and could not be counted. It is

true that in the case last referred to the statute provided that a ballot not numbered could not be counted. Our statute does not use the specific expression, that ballots of the kind and nature used by the independent-republican party of San Miguel county, cannot be counted, but it does say, in the spirit of the decisions in Nebraska and California, supra, that the thing done by the voter was an illegal act, of and concerning the ballot he cast, which act made it an illegal ballot, and therefore that it should not be counted because of its illegality. In Talcot v. Philbrick, 59 Conn. 472, wherein there was a contest of an election upon the grounds of the use of fraudulent ballots, the court said: "And it seems that it did not affect the case that the ballots were not prepared in that form fraudulently and with the intention of deceiving the voters."

I have examined all the cases cited and quoted in appellant's brief and every one is a case wherein the error or wrongful act was that of the election officers, with the exception of the case of Kellog v. Hickman, 21 Pac. 321. This case was one where the ballots were not in conformity with the statute of the State of Colorado, in this, that the ballots were printed on pale yellow paper three and one-quarter inches wide, the statute section 1281 providing that "all ballots shall be written on plain white paper or printed with black ink with a space of not less than one-fifth of an inch between each name, on plain white news-printing paper, not more than two and one-half inches nor less than two and three-eighth inches wide, without any device or mark by which one ticket may be known or designated from another, except the words at the head of the ticket, and it shall be unlawful for any person to print for distribution at the polls or distribute to any elector any ballot printed or written contrary to the provisions hereof." Section 1282 of said statute provides: "When ballots with a certain designated heading contain printed thereon in place of another a name not found on the reg-

ular ballot after such heading, such name shall be re-
regarded by the judges of election as having been placed
there for the purposes of fraud and such ballot shall not
be counted for the name so found." Section 1199 of
said statutes provides that "when it shall be found on
counting the votes that two or more tickets have been
deceitfully folded together, such tickets shall be re-
jected." The court, in its reasoning says: "It is also
declared that in the case described in said section 1199
and 1282 the judges of election shall not count the votes.
No other cases are mentioned in which the judges of
election are expressly authorized not to count the votes
received, inferring thereby that the reason for omitting
to declare as to violations in not preparing ballots of
proper width, they should be counted;—the statute ex-
pressly providing that under certain regulations they
should not be counted, as to all others they should be
counted. There is something certainly worthy of con-
sideration in this last contention by the court of Colo-
rado. While on the subject of excluding ballots because
of irregularities, it would be expected that the Legisla-
ture would expressly state all kinds of ballots that
should not be counted by the judges, and all other bal-
lots although irregular, not so expressly condemned,
would be considered lawful ballots. It will be observed
that the Legislature of New Mexico nowhere makes
provision for the rejection of any ballots by the judges
of election; nor does it anywhere expressly authorize the
judges of election not to count any ballots found in the
box. The dissenting opinion by Judge Helm (who is
recognized as one of the clearest and ablest of jurists),
in Kellogg v. Hickman, supra, is a far better exposition
of the law and principles than the opinion of the major-
ity of that court. The case of Allen v. Clynn, 29 Pac.
670—also a Colorado case—is one in which the error
complained of in the ballot was the mistake and error
committed by the officer who had the construction and
distribution of the official ballot in charge, under the

Australian ballot system, as it is commonly known, adopted by the Legislature of that State. It will also be observed that Judge Helm dissented in this case with a very able opinion. I find more justification for the conclusions reached in the two dissenting opinions of Judge Helm than in the opinions by the majority of the court.

For the reasons given, I dissent from the opinion of the majority of the court.